UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEVIN P. MURPHY, JOANN PODKUL, SUSAN SADLOWSKI GARZA, PATRICIA A. FISHER and ROSALIO CAMPOS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BP PRODUCTS NORTH AMERICA, INC., KCBX TERMINALS COMPANY, KOCH CARBON, LLC GEORGE J. BEEMSTERBOER, INC., and KM RAILWAYS, LLC<br><br>Defendants. | CASE NO.:<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs, individually on behalf of themselves and all others similarly situated, bring this Class Action Complaint against Defendant BP Products North America, Inc ("BP") KCBX Terminals Company ("KCBX"), Koch Carbon, LLC ("Koch Carbon"), George J. Beemsterboer, Inc. ("Beemsterboer") KM Railways, LLC ("KMR") in support alleges as follows:

### INTRODUCTION

1. This is an action brought by Plaintiffs, who are each owners and residents of real property contaminated by petroleum coke (hereinafter "petcoke") manufactured by BP and distributed and marketed by all of the Defendants.

2. The petcoke is a waste byproduct produced at BP's oil refinery in Whiting, Indiana. Petcoke contains high levels of heavy metals such as nickel and vanadium that are possibly carcinogenic in addition to large amounts of sulfur. The Safety Data Sheet for Petroleum Coke indicates that exposure to petcoke can cause skin, eye, or respiratory tract

1

irritation. It also warns that people should avoid accumulations of finely ground dust, and recommends that people not breathe the dust, and further recommends that "[i]ndirect vented, dust-tight goggles are recommended if dust is generated when handling" petcoke. (Safety Data Sheet -- Petroleum Coke, attached hereto as Exhibit A).

3. Instead of safely disposing of or deconstructing the petcoke, Defendants have chosen to sell it and to distribute it and to market it for profit. This joint marketing enterprise is an abnormally dangerous activity which consciously and deliberately disregards the known dangers of petcoke. It is a marketing enterprise that despoils and degrades every environment it touches.

## PARTIES

### The Defendants

4. BP is a Maryland corporation. Its headquarters and principal place of business are located at 28100 Torch Parkway, Warrenville, Illinois.

5. KCBX is a North Dakota corporation located and doing business at 3259 East 100th Street, Chicago, Illinois. KCBX owns, operates, and/or controls petcoke storage facilities located along or near the Calumet River, including but not limited to locations at 3259 East 100th Street, Chicago Illinois and 10730 South Burley Avenue. KCBX is a subsidiary of Koch Industries, Inc.

6. Koch Carbon is a Delaware limited liability company. Its principal place of business is 4111 E. 37th St. N. Wichita, Kansas. On information and belief it owns, operates and/or controls a petcoke storage facility located at or near 2900 East 106th Street, Chicago Illinois. Koch Carbon is a subsidiary of Koch Industries, Inc.

7. George J. Beemsterboer, Inc. is an Indiana corporation located and doing business at 2900 E. 106th Street, Chicago, Illinois. Beemsterboer owns, operates, and/or controls a petcoke storage and transfer facility at that location.

8. KMR is a Delaware limited liability company which owns the petcoke storage facility located at 10730 South Burley Avenue, along with adjacent rail equipment. KMR purchased this petcoke storage facility in December 2012. KMR is a subsidiary of Koch Industries, Inc.

## The Plaintiffs

9. Plaintiff Kevin P. Murphy is a citizen and resident of Chicago, Illinois. He, together with his wife, Plaintiff Joann Podkul, is the owner of the property located at 9913 S. Avenue H, which is in a community which has been and is being damaged by the migration of fugitive petcoke dust. Mr. Murphy and his family have been exposed to the airborne fugitive petcoke dust contamination of his home and property.

10. Plaintiff Joann Podkul is a citizen and resident of Chicago, Illinois. She, together with her husband, Plaintiff Kevin P. Murphy, is the owner of the property located at 9913 S. Avenue H, which is in a community which has been and is being damaged by the migration of fugitive petcoke dust. Ms. Podkul and her family have been exposed to the airborne fugitive petcoke dust contamination of her home and property.

11. Plaintiff Susan Sadlowski Garza is a citizen and resident of Chicago, Illinois. She is the homeowner of the property located at 10654 South Avenue G which is in a community which has been and is being damaged by the migration of fugitive petcoke dust. Ms. Garza and her family have been exposed to the airborne fugitive petcoke dust contamination of her home and property.

12. Plaintiff Patricia A. Fisher is a citizen and resident of Chicago, Illinois. She is the homeowner of the property located at 3457 East 106th Street, which is in a community which has been and is being damaged by the migration of fugitive petcoke dust. Ms. Fisher has been exposed to the airborne fugitive petcoke dust contamination of her home and property.

13. Plaintiff Rosalio Campos is a citizen and resident of Chicago, Illinois. He is the owner of property located at 10748 S. Mackinaw Avenue, which is in a community which has been and is being damaged by the migration of fugitive petcoke dust. Mr. Campos and his family have been exposed to the airborne fugitive petcoke dust contamination of her home and property.

## VENUE & JURISDICTION

14. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d). The claims are brought as a class action pursuant to Fed. R. Civ. P. 23 and involve an amount that exceeds $5,000,000 in controversy.

15. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants committed the wrongful conduct against members in this district, which is where most, if not all, class members reside.

## FACTUAL BACKGROUND

### Canadian Tar Sands Oil

16. Petcoke is the waste byproduct of refining tar sands oil extracted from beneath forests in Alberta Canada. This extraction, begun in earnest over the past decade, is itself highly controversial. It has been described as "the largest and most destructive project on earth" which "represents a major environmental disaster in Alberta." (Exhibit B – Executive Summary & Bibliography, 2010 Joint Report of National Resources Defense Counsel, Sierra Club,

EARTHWORKS, Corporate Ethics International, pp. 7, 5.)

17. Because Canadian tar sands oil is much heavier than conventional Crude oil, it could not be refined into transportation fuel with traditional refining machinery.

18. In order to refine and process Canadian Extra Heavy Oil ("CXHO") Defendant BP undertook an approximately $4 billion update and expansion of its oil refinery in Whiting Indiana. This project was identified by BP as Operation Canadian Crude in its Fugitive Air Permit 25484-2008 (1-30-2008) (hereinafter "the permit" and attached hereto as Exhibit C).

**Operation Canadian Crude**

19. The centerpiece of the refinery expansion was the construction of a new coker (coker #2), the largest coker in North America. According to the permit, the maximum rate of petcoke production at the refinery would go from 2,000 to 6,000 tons per day.

20. The BP permit specifically detailed precautions to be taken regarding the handling, storage and transfer of the petcoke at the Whiting refinery:

> Potential fugitive dust emissions may result from coke handling, storage and transfer operations. The coke handling system will be designed to minimize fugitive dust emission from the coke handling process[…]When the coking process is complete [and following the coke's watering and dewatering][…]it is moved by a bridge crane to a partially enclosed crusher. From the crusher the coke is conveyed in an enclosed conveyor to a transfer tower. The coke is then transferred using a series of enclosed conveyors to either the day bin for loadout into rail cars, or if necessary to the enclosed coke storage pile for temporary storage.

21. BP's coker #2 in Whiting is not yet fully operational. It has been operating at only partial capacity through 2012 and 2013.

22. Coker #2 is expected to become fully operational in the first quarter of 2014. Once fully operational the amount of petcoke waste byproduct created at the Whiting refinery will have increased from 700,000 tons per year to 2.2 million tons per year as a result of

Operation Canadian Crude.

**The Waste Product of Operation Canadian Crude –
The Distribution and Marketing of Petcoke**

23. Instead of safely disposing of or deconstructing its petcoke waste byproduct, BP has chosen to sell, distribute and market it for profit.

24. BP knows that petcoke cannot be used or marketed for use in the United States because of environmental restrictions and regulations. Consequently BP has chosen to market petcoke for use outside the United States rather than safely dispose of it or deconstruct it.

25. In order to market petcoke, BP and its co-defendants have chosen to distribute it through three distribution sites located in the center of a densely populated residential community in Chicago, Illinois, along the Calumet River at 100th, 106th and 108th streets on the city's far southeast side. Schools, churches, parks and public playgrounds line and are adjacent to both sides of the Calumet River from 100th to 108th streets. (Exhibit D – map & indices of the relevant location).

26. Petcoke is stored and distributed from these distribution sites completely unenclosed in the open air. This is so despite the fact that BP is required to enclose the petcoke at its Whiting refinery.

27. These open air distribution centers have been located in a community which is:

   a) environmentally scarred and vulnerable from decades of use as a worldwide center of steel production and petroleum refining; and

   b) now the center of a national environmental restoration campaign known as the Millennium Reserve – Calumet Core. The community contaminated by the petcoke is in the heart of the Calumet Core as described by Illinois Governor Patrick Quinn in his 2013 Executive Order (Attached as Exhibit E). The

Executive Order significantly notes:

- Calumet Core has a rich industrial heritage and associated labor culture that led to a richly diverse and vibrant immigrant community.
- Residents of the Millennium Reserve: Calumet Core have a justifiable pride in their role in building the United States of America;
- Calumet Core[…] now includes significant areas of existing or former industrial and manufacturing land that suffers from contamination, abandonment and fragmented ownership that stands in the way of economic revitalization in the area;
- The area within the Millennium Reserve: Calumet Core boundary has been economically challenged by the decline of heavy industry, the loss of jobs and that there is an opportunity to create new jobs in the land conservation, brownfield remediation, and public recreation industries.

28. Although BP's Operation Canadian Crude has not yet ramped up to full production, its effects are already being felt in the community.

29. In November 2013, the Attorney General of the State of Illinois on her own motion and at the request of the Illinois Environmental Protection Agency filed a Complaint (Attached hereto as Exhibit F) against one of the defendants herein, KCBX Terminals Company, regarding the storage and distribution of BP's petcoke at the 108th street distribution site. The Complaint alleges the following:

- Paragraph 8, in relevant part – "On September 20, 2013, and such other dates better known to the Defendant, the Defendant had approximately 350,000 tons of petroleum coke and coal at the site."

- Paragraph 9 – "At all times relevant to the Complaint, the Defendant has left the petroleum coke and coal piles at the Site uncovered and open to the environment."

- Paragraph 13 – "Petroleum coke and coal dust is a type of particulate

matter that can be emitted into the environment and carried by the wind into areas surrounding the Site. When petroleum coke and coal dust is blown off the Site into the nearby residential neighborhood, the dust gets into people's eyes, is inhaled and coats people's homes, outside play areas, cars and other personal property, thereby threatening human health and unreasonably interfering with the local residents' enjoyment of life and property."

- Paragraph 14 – "Particulate matter, including petroleum coke and coal dust, may be inhaled into the lungs and cause serious health problems, including aggravated asthma, decreased lung function, increased respiratory symptoms such as difficulty in breathing, irregular heartbeat, nonfatal heart attacks and premature death in people with heart or lung disease."

30. Each of the plaintiffs and other members of the community have experienced the petcoke invasion of their property as described above in the Attorney General's Complaint.

**CLASS ALLEGATIONS**

31. Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a class consisting of: All persons who own real property that has been contaminated with petcoke waste produced from the Whiting Refinery.

32. Specifically excluded from the Class are Defendants and any of their officers, any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, Defendants' legal representatives, and any municipal or governmental entity.

33. Members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is unknown to Plaintiffs, it is believed that the Class is comprised of at least thousands of members. The Class will be readily identifiable from public records.

34. Common questions of law and fact exist as to all members of the Class. The resolution of these common questions of law and fact will drive the resolution of the litigation.

35. Common legal and factual questions that will drive the resolution of the litigation include, but are not limited to:

   a) Whether Defendants released or discharged petcoke waste during the process of operating the Whiting Refinery;

   b) Whether Defendants' conduct in the refining, manufacture, handling, transport, or storage of oil byproducts resulted in the release, discharge, or spilling of petcoke waste;

   c) Whether Defendants had knowledge of the petcoke waste's likelihood to contaminate Plaintiffs' property;

   d) Whether Defendants manufacturing and distributing petcoke as alleged constituted an abnormally dangerous activity;

   e) Whether Defendants' conduct in marketing and distributing petcoke as alleged was willful and wanton;

   f) Whether petcoke waste released, discharged, or spilled by Defendants has trespassed on or contaminated Plaintiffs' property;

   g) Whether Defendants have created an unnatural dispersion or distribution of petcoke waste resulting in contamination of Plaintiffs' property; and

   h) Identification of the precise area of impact of the contamination caused by Defendants;

36. Plaintiffs' claims are typical of the members of the Class. Plaintiffs, like all other members of the Class, have sustained damages arising from Defendants' conduct alleged herein. Plaintiffs and the Class have been similarly or identically harmed by the same unlawful conduct

of Defendants.

37. Plaintiffs will fairly and adequately protect the interests of the Class and the Illinois Subclass because Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seek to represent. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation.

38. The class action mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Besides the predominance of questions common to all Class members, individual Class members lack resources to undertake the burden and expense of individual prosecution of these claims against these large corporate defendants, especially in comparison with the maximum individual recovery to which each Class member would be entitled. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. It also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

**CLAIMS FOR RELIEF**

**COUNT I**
**Willful and Wanton Conduct Claim**

39. Plaintiffs re-allege paragraphs 1 through 30 as if fully set forth herein.

40. The Defendants marketed and distributed petcoke from BP's Whiting refinery consciously and deliberately disregarding the known danger to the Plaintiffs and to their property.

41. This willful and wanton conduct of the Defendants in its conscious and deliberate

disregard of the known dangers to the Plaintiffs was a proximate cause of damage to the Plaintiffs and to their property. This includes damage to the value of the affected property, damage to the use and enjoyment of the affected property and the ongoing costs of cleaning their property.

## Count II

## Abnormally Dangerous Activity Claim

42. Plaintiffs re-allege paragraphs 1 through 30 as if fully set forth herein.

43. The distribution and marketing of petcoke as alleged is an abnormally dangerous activity in that it:

    a. Creates a high degree of risk of harm to the persons and property of the Plaintiffs;

    b. The harm resulting is great;

    c. Defendants have located distribution sites in the center of a densely populated residential community;

    d. So located this activity cannot be made safe;

    e. The petcoke has no value to the community while presenting a danger to the community;

    f. This activity is not commonly conducted in the center of a densely populated residential community.

44. Defendants' conduct in carrying out this abnormally dangerous activity is a proximate cause of damage to the Plaintiffs and to their property. This includes damage to the value of the affected property, damage to the use and enjoyment of the affected property and the ongoing costs of cleaning their property.

## Count III

### Strict Liability in Tort Claim

45. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

46. The Defendants have manufactured, sold, distributed and marketed a product, petcoke, in a condition which was unreasonably dangerous, to the property and persons of the Plaintiffs.

47. The product was in this condition when it damaged the persons and property of the Plaintiffs. This damage includes damage to the value of the affected property, to the use and enjoyment of the affected property and the ongoing costs of cleaning their property.

## COUNT IV
### Trespass Claim

48. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

49. Defendants had and have a duty to Plaintiffs and the Class to use reasonable care handling, maintenance, storage, and transport of petcoke waste, to prevent the discharge, or other escape of petcoke waste, to remediate any such discharge, to prevent any discharge from contaminating the property of others, and to remediate any such contamination.

50. Defendants breached the foregoing duty, failing to use reasonable care to ensure that petcoke waste would not be discharged or otherwise escape during the handling, maintenance, storage, and transport of petcoke waste.

51. Defendants' failure to take steps to ensure that petcoke waste would not trespass onto Plaintiffs' property was wrongful.

52. As a direct and proximate result of Defendants' intentional, willful and wanton, or negligent conduct, toxic chemicals in the form of petcoke waste have contaminated and continues to contaminate Plaintiffs' property.

53. Each time petcoke waste found and continues to find its way onto Plaintiffs' property a separate trespass occurred or occurs.

54. Damages from the petcoke waste that trespasses and has trespassed onto Plaintiffs' property continues to accrue and will continue to accrue.

55. Defendants' ongoing trespasses onto Plaintiffs' property is intentional, willful, and wanton, and/or negligent, and wrongful.

56. Defendants' ongoing trespasses onto Plaintiffs' property have interfered with Plaintiffs' use and enjoyment of their property, including but not limited to causing a diminution of value to that property.

57. Defendants' ongoing trespasses onto Plaintiffs' property have caused economic loss to Plaintiffs, including but not limited to reducing the value of the property and the ongoing costs of cleaning their property.

### COUNT V
### Public Nuisance Claim

58. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

59. The general public, including, Plaintiffs and the Class, has a public right to the use of streets, alleys, and other premises for recreational and commercial purposes in the areas contaminated by petcoke waste from the Whiting Refinery.

60. The general public, including, Plaintiffs and the Class, has a right to public health and safety.

61. Defendants have substantially and unreasonably interfered with these rights of the general public by continuing to allow discharge or other escape of petcoke waste.

62. Damages from the discharge or other escape of petcoke waste produced at the Whiting Refinery are ongoing, and will continue to accrue.

13

63. Plaintiffs and the Class have suffered special and particular injuries distinct from the general public, including diminution of the value of their property and the ongoing costs of cleaning their property. These distinct injuries are fairly traceable to Defendants' conduct as alleged herein.

64. Defendants' conduct described herein proximately caused the distinct injuries to Plaintiffs and the Class, which were direct and foreseeable consequences of Defendants failure to properly handle, maintain, store, and transport petcoke waste produced at the Whiting Refinery.

## COUNT VI
## Private Nuisance Claim

65. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

66. Petcoke waste has and continues to discharge or otherwise escape from Defendants' storage and transportation facilities and invaded Plaintiffs' and the Class' property, creating a physically offensive nuisance.

67. The invasions of Plaintiffs' and the Class' property are the direct and proximate result of Defendants' intentional, willful and wanton, or negligent conduct in failing to prevent or remediate the discharge or other escape of petcoke waste, and to prevent or remediate the contamination of others' property from petcoke waste.

68. The invasions of Plaintiffs property are substantial because the petcoke waste contamination is extensive and cumulative.

69. The invasions of Plaintiffs property is unreasonable because reach and extend of the damages to Plaintiffs as measured against the lack of utility of the nuisance weighs in favor of Plaintiffs' interests.

70. Plaintiffs and the Class have suffered injury as a result of Defendants' nuisance, including diminution of value of their property and the ongoing costs of cleaning their property.

## COUNT V
## Unjust Enrichment Claim

71. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

72. Defendants have enjoyed substantial profits from their manufacture, distribution and marketing of petcoke.

73. Plaintiffs' damages are a direct result of Defendant BP's choice to not safely dispose of or deconstruct its petcoke waste byproduct but rather to, together with its co-Defendants, sell, distribute and market the petcoke.

74. The damage caused to Plaintiffs' property is significant and will not be adequately compensated by the ordinary measure of damage to real property.

75. Defendants' profits acquired at the expense of contaminating Plaintiffs' property is an unjust enrichment of the Defendants.

76. Defendants should, in fairness and in equity, disgorge the profits enriching them at the Plaintiffs' expense.

## COUNT VI
## Declaratory Relief Claim

77. Plaintiffs repeat and re-allege paragraphs 1 through 30 as if fully set forth herein.

78. Plaintiffs bring this claim on behalf of the Class, or, in the alternative on behalf of the Illinois Subclass pursuant to 28 U.S.C. § 2201.

79. There is an actual controversy between Plaintiffs and the Class on one hand, and Defendants on the other regarding the storage and transport of petcoke waste from the Whiting Refinery.

80. Pursuant to 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could

be sought."

81. Defendants handled, transported, and stored petcoke waste from the Whiting Refinery in such a way to cause discharge or other escape of petcoke waste onto Plaintiffs' and the Class' property.

82. Accordingly, Plaintiffs seek a declaration (a) stating Defendants have caused the discharge of petcoke waste onto Plaintiffs' property, (b) stating that Defendants had and have knowledge that petcoke waste is abnormally dangerous, (c) stating Defendants are liable under each of the above-referenced causes of action by virtue of the complained of conduct, (d) requiring Defendants to take all necessary measures to prevent the discharge of petcoke waste in the future, including prohibiting BP from distributing petcoke into the subject densely populated residential community, (e) requiring Defendants to remedy all past and future petcoke waste discharge, (f) stating that Defendants are liable for all appropriate damages, including punitive damages, under said causes of action, and (g) stating that Defendants are liable for all appropriate attorneys' fees and costs under said causes of action.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendants as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of the Plaintiffs and the Class on all counts asserted herein;

C. For an order awarding damages, including punitive damages, in an amount to be determined by the Court or jury;

D. For prejudgment interest on all amounts awarded;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Appropriate injunctive relief, including prohibiting BP from distributing petcoke into the subject densely populated residential community;

G. For an order awarding Plaintiffs and the Class reasonable attorneys' fees and expenses and costs of suit; and

H. For further relief as the Court deems appropriate.

Date: November 25, 2013

Respectfully submitted,

/s/ Robert J. Pavich_____
ROBERT JAMES PAVICH
PAVICH LAW GROUP, P.C.
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)
rpavich@pavichlawgroup.com

JEFFREY A. LEON
JAMIE E. WEISS
ZACHARY A. JACOBS
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, Illinois
(847) 433-4500
(847) 433-2500 (fax)
jeff@complexlitgroup.com

IAN H. LEVIN
JOHN J. PAVICH
PAVICH LAW GROUP, P.C.
20 South Clark Street, Suite 700
Chicago, Illinois 60603
(312) 782-8500
(312) 853-2187 (FAX)

KEVIN ROGERS
LAW OFFICES OF KEVIN ROGERS
307 N. Michigan Avenue, Suite 305
Chicago, Illinois 60601
(312) 332-1188
(312) 332-0192 (FAX)
Kevin@KevinRogersLaw.com